[NOT SCHEDULED FOR ORAL ARGUMENT]

No. 09-5377

_____
_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT
_____

CATHOLIC HEALTH INITIATIVES, ET AL.,
Appellants,


v.


KATHLEEN SEBELIUS, Secretary, United States
Department of Health and Human Services,
Appellee.
_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

BRIEF FOR THE APPELLANTS

_____

Paul D. Clement
Christopher L. Keough
J. Harold Richards
King & Spalding LLP
1700 Pennsylvania Avenue, N.W.
Suite 200
Washington, DC 20006
(202) 737-0500

## CERTIFICATE AS TO PARTIES, RULINGS,
## AND RELATED CASES

**A.    Parties and Amici**

Appellants, plaintiffs below, are Catholic Health Initiatives, a nonprofit charitable purpose corporation with its headquarters in Denver, Colorado, and a group of affiliated nonprofit hospitals that participate in the Medicare program.   A complete listing of the Appellant hospitals is included in Attachment A to this certificate.

Pursuant to Circuit Rule 26.1, the undersigned certifies that the Appellants are all private non-profit, tax-exempt organizations and that no publicly-held corporations have a ten percent or greater ownership interest in the Appellants. Catholic Health Initiatives served as a parent company, as defined in Circuit Rule 26.1, to all of the hospitals listed on Attachment A during the time periods at issue here.

Appellee, defendant below, is Kathleen Sebelius, Secretary of the United States Department of Health and Human Services.

There are no intervenors or amici in this action.

**B.    Rulings Under Review**

The ruling under review is the memorandum opinion and order issued by the Honorable Paul L. Friedman on September 30, 2009, in civil action number 07-555. *Catholic Health Initiatives v. Sebelius*, 2009 WL 3112575.

**C.**   **Related Cases**

The case on review was before the United States District Court for the District of Columbia, civil action no. 07-555.  The case was not previously before this Court or any other court.  Counsel for Appellants is not aware of any other related cases "involving substantially the same parties and the same or similar issues" as defined in Circuit Rule 28(a)(1)(C).

Respectfully submitted,

/s/ Paul D. Clement
Paul D. Clement

## ATTACHMENT  A

| Hospital Name | Immediate Parent Corporation or Successor in Interest |
|---|---|
| St. Anthony's Medical Center | St. Anthony's Hospital Corporation |
| St. Vincent Infirmary Medical Center | St. Vincent Infirmary Medical Center d/b/a St. Vincent Health System |
| St. Vincent Medical Center North | St. Vincent Infirmary Medical Center d/b/a St. Vincent Health System |
| St. Mary-Corwin Medical Center | Catholic Health Initiatives Colorado |
| Mercy Regional Medical Center of Durango | Mercy Regional Medical Center of Durango |
| St. Anthony Central Hospital | Catholic Health Initiatives Colorado |
| St. Thomas More Hospital | Catholic Health Initiatives Colorado |
| Penrose/St. Francis Health Services | Catholic Health Initiatives Colorado |
| St. Anthony North Hospital | Catholic Health Initiatives Colorado |
| Mercy Medical Center, Nampa | Mercy Medical Center, Nampa |
| Mercy Medical Center - Des Moines | Catholic Health Initiatives - Iowa, Corp. |
| St. Catherine Hospital | St. Catherine Hospital |
| Central Kansas Medical Center | Central Kansas Medical Center |
| St. John's Maude Norton Memorial Hospital | Hospital was sold effective Nov. 1, 2009. Seller, MNMCH, Inc., retains the rights to receivables for periods prior to the sale. |
| St. Joseph Hospital | Saint Joseph Health System, Inc., f/k/a Saint Joseph Healthcare, Inc. |

| Hospital Name | Immediate Parent Corporation or Successor in Interest |
|---|---|
| Saint Joseph London f/k/a Marymount Medical Center | Hospital merged with Saint Joseph Health System, Inc., effective June 30, 2008. |
| Saint Joseph Martin f/k/a Our Lady of the Way Hospital | Hospital merged with Saint Joseph Health System, Inc., effective June 30, 2008. |
| Sts. Mary & Elizabeth Hospital f/k/a Caritas Medical Center | Hospital was transferred effective Nov. 1, 2005. Catholic Health Initiatives is the successor in interest for periods prior to the merger. |
| Our Lady of Peace f/k/a Caritas Peace Center | Hospital was transferred effective Nov. 1, 2005. Catholic Health Initiatives is the successor in interest for periods prior to the merger. |
| St. Joseph Medical Center, Inc. | St. Joseph Medical Center, Inc. |
| St. Francis Healthcare Campus | St. Francis Medical Center |
| Lakewood Health Center | Lakewood Health Center |
| St. John's Regional Medical Center | Hospital was sold effective Nov. 1, 2009. Seller corporation, St. John's Regional Medical Center, retains the rights to receivables for periods prior to the sale. |
| Good Samaritan Hospital, Kearney, Nebraska | Good Samaritan Hospital, Kearney, Nebraska |
| Saint Elizabeth Regional Medical Center | Saint Elizabeth Regional Medical Center |
| Saint Francis Medical Center | Saint Francis Medical Center |
| St. Mary's Community Hospital | St. Mary's Community Hospital |
| Richard H. Young Hospital | Good Samaritan Health Hospital, Kearney, Nebraska |

| Hospital Name | Immediate Parent Corporation or Successor in Interest |
|---|---|
| St. Joseph Medical Center | Hospital was sold effective Sep. 6, 2002. Catholic Health Initiatives is the successor in interest for periods prior to the sale. |
| St. Joseph Northeast Heights Hospital | Hospital was sold effective Sep. 6, 2002. Catholic Health Initiatives is the successor in interest for periods prior to the sale. |
| St. Joseph West Mesa Hospital | Hospital was sold effective Sep. 6, 2002. Catholic Health Initiatives is the successor in interest for periods prior to the sale. |
| St. Joseph Rehabilitation Hospital | Hospital was sold effective Sep. 6, 2002. Catholic Health Initiatives is the successor in interest for periods prior to the sale. |
| St. Joseph's Hospital and Health Center | St. Joseph's Hospital and Health Center |
| Mercy Hospital of Valley City | Mercy Hospital of Valley City |
| Oakes Community Hospital | Oakes Community Hospital |
| Mercy Medical Center | Mercy Medical Center |
| Mercy Hospital of Devil's Lake | Mercy Hospital of Devil's Lake |
| Carrington Health Center | Carrington Health Center |
| The Good Samaritan Hospital of Cincinnati, Ohio | The Good Samaritan Hospital of Cincinnati, Ohio |
| St. Elizabeth Health Services, Inc. | St. Elizabeth Health Services, Inc. |
| Mercy Medical Center, Inc. | Prior parent corporation, Mercy Healthcare, Inc., merged with subsidiary corporation on Aug. 25, 2006 |

| Hospital Name | Immediate Parent Corporation or Successor in Interest |
|---|---|
| Holy Rosary Medical Center | Holy Rosary Medical Center f/k/a The Dominican Sisters of Ontario, Inc. |
| St. Anthony Hospital | St. Anthony Hospital |
| St. Joseph Hospital | Hospital was sold effective July 1, 2000. St. Joseph Regional Health Network is the successor in interest for periods prior to the sale. |
| St. Joseph Medical Center | St. Joseph Regional Health Network |
| St. Mary's Healthcare Center of Pierre, S.D. | St. Mary's Healthcare Center of Pierre, S.D. |
| Memorial Hospital | Memorial Health Care System, Inc. |
| St. Clare Hospital | Franciscan Health System |
| St. Joseph Medical Center | Franciscan Health System |
| St. Francis Hospital | Franciscan Health System |
| Franciscan Villa | Franciscan Villa of South Milwaukee, Inc. |

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

TABLE OF AUTHORITIES ............................................................... iii

GLOSSARY ....................................................................................x

STATEMENT OF JURISDICTION ....................................................1

STATEMENT OF THE ISSUE .........................................................1

STATEMENT OF FACTS ...............................................................3

     A.    Medicare Reimbursement for Reasonable Costs .................3

     B.    Establishment of First Initiatives............................................9

     C.    Operation and Oversight of First Initiatives.......................10

     D.    Proceedings Below ............................................................13

SUMMARY OF ARGUMENT ........................................................16

STANDARD OF REVIEW .............................................................21

ARGUMENT .................................................................................21

     A.    The Secretary's Final Decision Exceeds Her Statutory
          Authority and Is Otherwise Inconsistent with the Medicare
          Statute and Regulations ....................................................21

     B.    The Secretary's Decision Is Not Supported by Substantial
          Evidence in the Record .....................................................36

     C.    The Secretary Must, at a Minimum, Reimburse the Hospitals
          For Medicare's Share of the Claims Paid and Administrative
          Expenses of the Hospitals' Insurance Program...................49

## TABLE OF CONTENTS (CONT.)

CONCLUSION .......................................................................................55

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES
<u>Cases</u>

*Appalachian Power Co. v. EPA*
    208 F.3d 1015 (D.C. Cir. 2000).....................................................32

*Athens Community Hosp., Inc. v. Schweiker*
    743 F.2d 1 (D.C. Cir. 1984).........................................................13

*BellSouth Telecomm., Inc. v. FCC*
    469 F.3d 1052 (D.C. Cir. 2006).....................................................39

*Bethesda Hosp. Ass'n v. Bowen*
    485 U.S. 399 (1988)....................................................................13

*Burlington N. & Santa Fe Ry. Co. v. Surface Trans. Bd.*
    403 F.3d 771 (D.C. Cir. 2005)............................................19, 38, 53

*Burlington Truck Lines v. United States*
    371 U.S. 156 (1962)....................................................................47

*Chem. Mfrs. Ass'n v. EPA*
    217 F.3d 861 (D.C. Cir. 2000)................................................39, 40

*Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*
    467 U.S. 837 (1984)....................................................................22

*\*D&F Alfonso Realty Trust v. Garvey*
    216 F.3d 1191 (D.C. Cir. 2000)..........................................20, 48, 54

*Equal Employment Opportunity Comm'n v. Arabian American Oil Co.*
    499 U.S. 244 (1991)...............................................................28, 29

*Garrett v. FCC*
    513 F.2d 1056 (D.C. Cir. 1975)....................................................38

*GCI Health Care Ctrs., Inc. v. Thompson*
    209 F.Supp.2d 63 (D.D.C. 2002).....................................................6

*Authorities upon which we chiefly rely are marked with asterisks.

Cases (cont.)

*Gen. Elec. Co. v. U.S. EPA*
    53 F.3d 1324 (D.C. Cir. 1995)......................................................20, 21, 51, 52

*Group Life & Health Insurance Co v. Royal Drug Co.*
    440 U.S. 205 (1979)........................................................................................28

*Health Ins. Ass'n of Am., Inc. v. Shalala*
    23 F.3d 412 (D.C. Cir. 1994)............................................................29, 32, 33

*In re Medicare Reimbursement Litig.*
    414 F.3d 7 (D.C. Cir. 2005)....................................................................4, 13

*Lakeland Bus Lines, Inc. v. NLRB*
    347 F.3d 955 (D.C. Cir. 2003)................................................................39, 40

*LGH, Ltd. v. Sullivan*
    786 F.Supp. 1047 (D.D.C. 1992)..............................................................7, 26

*\*Mem'l Hosp./Adair County Health Ctr., Inc. v. Bowen*
    829 F.2d 111 (D.C. Cir. 1987)....................................................18, 33-36, 44

*Methodist Hosp. of Sacramento v. Shalala*
    38 F.3d 1225 (D.C. Cir. 1994)....................................................................21

*Morall v. Drug Enforcement Admin.*
    412 F.3d 165 (D.C. Cir. 2005)................................................................39, 40

*\*Motor Vehicle Mfrs. Ass'n of the U. S., Inc. v. State Farm Mut. Auto. Ins. Co.*
    463 U.S. 29 (1983).........................................................................37, 39, 47

*Nat'l Fuel Gas Supply Corp. v. FERC*
    468 F.3d 831 (D.C. Cir. 2006)......................................................................39

*Petrol. Commc'ns, Inc. v. FCC*
    22 F.3d 1164 (D.C. Cir. 1994)......................................................................38

Cases (cont.)

*Saint Mary of Nazareth Hosp. Ctr. v. Schweiker*
    718 F.2d 459 (D.C. Cir. 1983).............................................................20, 50

*Se. Ala. Med. Ctr. v. Sebelius*
    572 F.3d 912 (D.C. Cir. 2009)......................................................21

*SEC v. Nat'l Securities, Inc.*
    393 U.S. 453 (1969)...................................................................29

*Shalala v. Guernsey Mem'l Hosp.*
    514 U.S. 87 (1995)...................................................................32

*Transactive Corp. v. United States*
    91 F.3d 232 (D.C. Cir. 1996).......................................................38

*Walter O. Boswell Mem'l Hosp. v. Heckler*
    749 F.2d 788 (D.C. Cir. 1984)..................................................7, 26

## Federal Statutes

5 U.S.C. § 553 ...................................................................................32

5 U.S.C. § 706(2)(A) .....................................................................36, 37

5 U.S.C. § 706(2)(C) .....................................................................22, 29

5 U.S.C. § 706(2)(E) .....................................................................36, 37

15 U.S.C. § 1012 .................................................................................28

28 U.S.C. § 1291 ...................................................................................1

29 U.S.C. § 1104(a)(1)(C) ............................................................47, 48

42 U.S.C. §§ 1395 *et seq.*......................................................................3

42 U.S.C. § 1395 ...............................................................................5, 24

42 U.S.C. § 1395f(*l*) ..............................................................................3

42 U.S.C. § 1395*l*(a)(2)(B) ...................................................................3

42 U.S.C. § 1395m(g)(1) .......................................................................3

*42 U.S.C. § 1395x(v)(1)(A) ....................................... 4, 5, 17, 23, 24, 25, 30, 49, 50

42 U.S.C. § 1395oo(a) .........................................................................14

42 U.S.C. § 1395oo(f) .........................................................................14

42 U.S.C. § 1395oo(f)(1) .......................................................................1

42 U.S.C. § 1395oo(h) .........................................................................14

42 U.S.C. § 1395ww(d) .........................................................................4

## Code of Federal Regulations

42 C.F.R. § 405.1803 ...................................................................13

42 C.F.R. § 405.1835 ...................................................................14

*42 C.F.R. § 413.9 ...................................................18, 23, 24, 33

42 C.F.R. § 413.9(a) ...................................................5, 25, 26, 30

42 C.F.R. § 413.9(b) .................................................................5, 24

42 C.F.R. § 413.9(b)(2) ............................................................6, 25

42 C.F.R. § 413.9(c)(1) .................................................................6

42 C.F.R. § 413.9(c)(2) .................................................................6

42 C.F.R. § 413.9(c)(3) .................................................................6

42 C.F.R. § 413.17 ......................................................................13

42 C.F.R. § 413.100(c)(2)(iii)(C) .................................................53

42 C.F.R. § 413.100(c)(2)(vii)(A)-(B) .........................................53

## Federal Register

65 Fed. Reg. 40535 (June 30, 2000) ..............................................3

## State Statutes

Ariz. Rev. Stat. Ann. § 20-1098.10.B (2007) ..........................................................41

Ark. Code Ann. § 23-63-1610(b)(1) (West 2007) ...................................................41

Colo. Rev. Stat. Ann. § 10-6-121(2)(a) (West 2003) ........................................41, 42

Del. Code Ann. tit. 18, § 6910(b) (West 2007) ......................................................41

Ga. Code Ann. § 33-41-18(2) (West 2007) .............................................................41

215 Ill. Comp. Stat. 5/123C-12 (2004) ...................................................................41

Kan. Stat. Ann. § 40-4310 (West 2007) ..................................................................41

Ky. Rev. Stat. Ann. § 304.49-100(2) (West 2007) .................................................41

Mont. Code Ann. § 33-28-202(2) (West 2007) .......................................................41

Nev. Rev. Stat. Ann. § 694C.340(2) (West 2007) ..................................................41

N.Y. Ins. Law, § 7009(a) (McKinney 2007) ..........................................................41

Okla. Stat. Ann. tit. 36 § 6470.15.B (West 2007)...................................................41

S.C. Code Ann. § 38-90-100(B) (2007)...................................................................41

S.D. Codified Laws § 58-46-19 (2007) ...................................................................41

Ut. Code Ann. § 31A-37-302(2)(a) (West 2007) ....................................................41

W. Va. Code Ann., § 33-31-10(b) (West 2007) ......................................................41

Vt. Stat. Ann. tit. 8, § 6010(b) (2002).........................................................40, 41, 42

Other Authorities

*Gateway Community Hospital v. Blue Cross and Blue Shield Ass'n /*
*Blue Cross and Blue Shield of Florida* PRRB Dec. No. 92-D50,
Medicare & Medicaid Guide (CCH) ¶ 40,834 (Aug. 20, 1992)..............26, 27

Provider Reimbursement Manual, Forward........................................................6, 32

Provider Reimbursement Manual § 115 ....................................................................2

Provider Reimbursement Manual § 2150 ................................................................13

Provider Reimbursement Manual § 2150.3 .............................................................13

Provider Reimbursement Manual § 2160.2 ..................................................7, 18, 26

Provider Reimbursement Manual § 2162.A ..................................................7, 18, 26

Provider Reimbursement Manual § 2162.C ......................................................27, 28

Provider Reimbursement Manual § 2162.2 ............................................................27

Provider Reimbursement Manual § 2162.2.A .........................................7, 18, 26, 27

Provider Reimbursement Manual § 2162.2.A.4 ..............................................1, 2, 8

Provider Reimbursement Manual § 2162.13 ....................................................30, 51

Provider Reimbursement Manual § 2305 ..........................................................52, 53

S. Rep. No. 404, 89th Cong., 1st Sess. (1965), reprinted in
1965 U.S.C.C.A.N. 1943, 1976........................................................4, 23, 24

# GLOSSARY

| | |
|---|---|
| AR | Administrative Record |
| First Initiatives | First Initiatives Insurance, Ltd. |
| Hospitals | Appellant Hospitals |
| Manual | Provider Reimbursement Manual |
| Pl. Stmt. | Plaintiff's Statement of Material Facts As To Which There Is No Genuine Dispute |
| PRRB or Board | Provider Reimbursement Review Board |
| Secretary | The Secretary, United States Department of Health and Human Services |

## STATEMENT OF JURISDICTION

Appellants brought this action in the district court pursuant to 42 U.S.C. § 1395oo(f)(1) for judicial review of the final decision of the Secretary of Health and Human Services ("Secretary") denying Medicare reimbursement for malpractice and other liability insurance premiums incurred by, or liability claims paid on behalf of, the Appellant hospitals ("Hospitals"). The district court granted the Secretary's motion for summary judgment and denied the Hospitals' motion for summary judgment in a memorandum opinion and order dated September 30, 2009. The Hospitals timely filed a notice of appeal to this Court on October 29, 2009. This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUE

This case concerns Medicare cost reimbursement for malpractice and other liability insurance premiums incurred by the Hospitals during their cost reporting periods ending between 1997 and 2002. The Hospitals were insured against liability claims by First Initiatives Insurance, Ltd. ("First Initiatives"), which was owned by the Hospitals' parent organization, Catholic Health Initiatives.

The Secretary's Provider Reimbursement Manual ("Manual") restricts the investments made by a captive insurer, like First Initiatives, that is domiciled

- 1 -

outside the United States. *See* Provider Reimbursement Manual § 2162.2.A.4.[1]  In addition to other restrictions, the Manual decrees that a captive insurer domiciled outside the United States may invest no more than ten percent of its assets in equity securities. *Id.*

The Hospitals voluntarily disclosed that First Initiatives invested more than ten percent of its assets in equities, protested the denial of reimbursement for the costs of their liability insurance premiums in compliance with applicable provisions of the Secretary's Manual, *see* Provider Reimbursement Manual § 115, and filed timely appeals.

The Secretary's final decision, which the district court upheld, found that the Hospitals were entitled to no reimbursement at all for the costs of liability insurance premiums paid by the Hospitals to First Initiatives, or the liability claims paid on their behalf by First Initiatives, because the captive insurer's investments had failed to comply with the Manual's investment restrictions.

Specifically, the following issues are on review before this Court:

1) Whether the Secretary's authority to determine the reasonable cost of hospital services to patients empowers her to dictate the extent to which a captive insurer domiciled abroad invests in equities.

---

[1] This and other selected statutes, regulations, and Manual provisions are reproduced in an Addendum to this brief.

2) Whether Secretary's determination that captive insurers domiciled abroad are inherently more risky and subject to less regulation than captives domiciled domestically is based upon substantial evidence in the record or is otherwise arbitrary and capricious.

3) Whether the district court erred in upholding the Secretary's denial of the Hospitals' alternative claim that if the disallowance of their accrued premium expenses incurred for the periods at issue was reasonable, then the Hospitals should, at a minimum, be reimbursed for the actual liability claims paid on their behalf by First Initiatives.

## STATEMENT OF FACTS

### A.    Medicare Reimbursement for Reasonable Costs

The federal Medicare program, 42 U.S.C. §§ 1395 *et seq.*, pays participating hospitals for covered services provided to Medicare beneficiaries. During the 1997-2002 periods at issue here, Medicare paid for critical access hospital services and for outpatient services furnished by general acute hospitals on a *retrospective*, *reasonable cost* reimbursement basis.[2]  *See* 42 U.S.C. §§ 1395f(*l*), 1395m(g)(1), 1395*l*(a)(2)(B).   This case concerns reasonable cost reimbursement for costs of

---

[2] A prospective payment system for outpatient services was implemented August 1, 2000.  65 Fed. Reg. 40535, 40535 (June 30, 2000).

services furnished to hospital outpatients and services furnished by critical access hospitals.[3]

At the beginning of the Medicare program in 1965, all inpatient and outpatient services covered under Medicare were paid on a reasonable cost reimbursement basis.  Since then, the Medicare statute has defined "reasonable cost" as "the cost actually incurred, excluding therefrom any part of incurred cost found to be unnecessary in the efficient delivery of needed health services." 42 U.S.C. § 1395x(v)(1)(A).  The intent of this statutory provision is "to meet the *actual costs*, however widely they may vary from one institution to another, except where a particular institution's costs are found to be *substantially out of line* with those of institutions similar in size, scope of services, utilization, and other relevant factors."  S. Rep. No. 404, 89th Cong., 1st Sess. (1965), *reprinted in* 1965 U.S.C.C.A.N. 1943, 1976 (emphasis added).  The statute authorizes the Secretary to adopt regulations defining the methods used and the items included in the determination of reasonable costs.  42 U.S.C. § 1395x(v)(1)(A).  This broad delegation is subject to a limitation that "under the methods of determining costs, the necessary costs of efficiently delivering covered services to individuals covered

---

[3] For most general acute care hospitals, Medicare payment for *inpatient* services is made under a *prospective* payment system based on predetermined rates per discharge.  *See* 42 U.S.C. § 1395ww(d); *In re Medicare Reimbursement Litig.*, 414 F.3d 7, 9 (D.C. Cir. 2005).  The prospective payment system for *inpatient* services is not at issue in this case.

- 4 -

by the insurance programs established by this subchapter will not be borne by individuals not so covered, and the costs with respect to individuals not so covered will not be borne by such insurance programs." *Id*. It was not intended to empower the Secretary to micromanage aspects of hospital operations and management having little or nothing to do with the actual costs of services furnished to patients. *See* 42 U.S.C. § 1395 (stating that no provision in the Medicare statute "shall be construed to authorize any Federal officer or employee . . . to exercise any supervision or control over the administration or operation of any such institution, agency, or person [that provides health services]").

Consistent with the statute's intent to reimburse hospitals for their actual costs incurred in the efficient delivery of necessary health services, the Secretary's implementing regulation provides that "[a]ll payments to providers of services must be based on the reasonable cost of services covered under Medicare and related to the care of beneficiaries." 42 C.F.R. § 413.9(a). The regulation's definition of "reasonable cost" reiterates the fundamental statutory objective that "under the methods of determining costs, the costs with respect to individuals covered by the program will not be borne by individuals not so covered, and the costs with respect to individuals not so covered will not be borne by the program." *Id*. § 413.9(b).

The regulation defines "necessary and proper costs" to mean

> costs that are appropriate and helpful in developing and maintaining the operation of patient care facilities and activities. They are usually costs that are common accepted occurrences in the field of the provider's activity.

*Id*. § 413.9(b)(2).

In describing the application of reasonable cost reimbursement principles, the regulation states the program's intent that payment to providers of services should be "fair to the providers," *id*. § 413.9(c)(1), should meet actual costs incurred that are not shown to be substantially out of line with costs incurred by similar providers for comparable services, *id*. § 413.9(c)(2), and should be based on actual direct and indirect costs related to patient care, *id*. § 413.9(c)(3).

The Secretary's Manual is a compilation of rules that have not been promulgated through the notice and comment rulemaking provisions of the Administrative Procedure Act. The Foreword to the Manual explains that it "provides guidelines and policies to implement Medicare regulations which set forth principles for determining the reasonable cost of provider services." The Foreword also acknowledges that the Manual guidelines do not "have the effect of regulations." *See also GCI Health Care Ctrs., Inc. v. Thompson*, 209 F. Supp. 2d 63, 70-71 (D.D.C. 2002) (noting that the Manual "contain[s] informal interpretive rules that do not carry the force of law").

The Secretary's Manual recognizes that liability insurance is a necessary and proper cost related to patient care. *See* Provider Reimbursement Manual § 2160.2 (stating that liability damages that should have been, but were not, covered by insurance are not allowable); *id.* §§ 2162.A, 2162.2.A (noting that liability insurance premiums are allowable costs); *accord Walter O. Boswell Mem'l Hosp. v. Heckler*, 749 F.2d 788, 799 (D.C. Cir. 1984) (noting that "[g]iven the size and frequency of malpractice awards, one can reasonably assume that malpractice insurance is necessary for 'adequate' [insurance] coverage, and thereby infer that [the Secretary] considers malpractice insurance for Medicare patients necessary and thus compensable"); *LGH, Ltd. v. Sullivan*, 786 F. Supp. 1047, 1053 (D.D.C. 1992).

The Secretary's Manual imposes additional conditions on reimbursement for costs incurred to obtain liability insurance from a "captive" insurer, an insurer that is owned by the entities that it insures, some of which reasonably bear upon the costs of such insurance. For example, the Manual provides that, in general, the premiums paid to a captive insurer are allowable if they do not exceed the cost of comparable commercial insurance, the captive is established under and complies with the laws of its domicile, and the captive has an adequate claims management and risk management program. Provider Reimbursement Manual § 2162.2.A. These provisions are not at issue here.

The Secretary's Manual also purports to prescribe additional limitations, however, on investments made by a captive insurer that is domiciled outside of the United States.  In particular, the Manual denies reimbursement altogether for any premiums paid to a captive domiciled outside the United States that invests more than ten percent of its assets in equity securities.  Provider Reimbursement Manual § 2162.2.A.4.  The Manual also provides that even if a captive complies with the ten percent maximum, its investments in equity securities must be in "dividend paying equity securities listed on a United States stock exchange."  *Id.*  Neither of these investment limitations applies to a captive insurer that is domiciled within the United States.  *Id.*

These investment restrictions were applied by the Secretary's Board in this case to disallow Medicare reimbursement for any of the premiums paid to the Hospitals' captive insurer, which was domiciled in the Cayman Islands.  It is undisputed that, had the Hospitals' captive insurer been domiciled within the United States, but had the identical equity investment portfolio, Medicare would have paid its full share of the Hospitals' malpractice insurance premium expenses.  Administrative Record ("AR") 275-76.

**B.**    <u>**Establishment of First Initiatives**</u>

Catholic Health Initiatives owns and controls First Initiatives, a subsidiary "captive" insurer. AR 207-08. First Initiatives pays for any valid liability claims against the Hospitals. AR 208-09, 211-13.

Catholic Health Initiatives created First Initiatives shortly after a 1996 merger of three predecessor health care systems that consolidated to form Catholic Health Initiatives. AR 203-09. Before the merger, the three predecessor health care systems had obtained liability insurance coverage through three separate programs involving two captive insurers and a trust. AR 208, 328-29. Following the 1996 merger, Catholic Health Initiatives consolidated the three liability insurance programs into a single program through First Initiatives. AR 204-10, 319-72.

In connection with the consolidation of the three liability insurance programs, Catholic Health Initiatives solicited and acted upon the recommendations of independent consultants and an advisory board regarding several alternative means of obtaining the necessary liability coverage for the Hospitals. AR 204-11, 319, 345-55. After careful consideration of the other alternatives, Catholic Health Initiatives decided to consolidate the three programs into a captive insurer funded through premiums paid by the Hospitals. AR 206-09, 345-55.

In addition, the independent consultants reviewed, and Catholic Health Initiatives considered, several alternative domiciles for the captive insurer, including Vermont, which was at the time the domicile for the largest number of domestic healthcare captive insurers.  AR 207, 270, 355-62.  Ultimately, Catholic Health Initiatives decided to establish the captive's domicile in the Cayman Islands because this was less costly than other alternatives and met Catholic Health Initiatives' goals of increased coverage flexibility and the ability to extend coverage to strategic partners.  AR 208-11, 365, 372.  Catholic Health Initiatives determined that establishing the insurer in the Caymans would save the Hospitals anywhere from $108,980 to $293,475 in administrative expenses in the first year, a result that was later confirmed by subsequent analysis.  AR 372.  In addition, an analysis conducted by an independent consultant, Aon, determined that for fiscal year 2000 alone, Catholic Health Initiatives would have paid $15 million (or 17 percent) more to purchase comparable coverage from a commercial insurer. AR 218-19, 2870-71.

## C.    <u>Operation and Oversight of the Captive Insurer</u>

During the period at issue, the Hospitals paid premiums to fund property and casualty insurance coverage through First Initiatives.[4]  AR 208-09, 211-13.  The Hospitals' annual premiums were determined by actuarial projections of liability

---

[4] First Initiatives does not provide life or health insurance.  AR 208-09.

loss costs and administrative expenses. *See* AR 213, 241-42, 3107-08. First Initiatives in turn reimbursed Catholic Health Initiatives for the claims that it administered and paid on behalf of the Hospitals. *See* AR 211-13.

The amount of claims paid by First Initiatives during the years at issue is substantial. For example, First Initiatives' audited financial statements show that it paid claims in amounts ranging from $31.5 million for fiscal year 1998 to $57.6 million for fiscal year 1999. AR 736, 3098. In addition, the amount held by First Initiatives as a result of premiums paid and returns on investments to cover current and future claims against Catholic Health Initiatives' hospitals is also substantial, totaling $356.7 million as of June 30, 2000.[5] AR 3087.

In view of the hundreds of millions of dollars that the Hospitals have paid to First Initiatives to cover claims against them, First Initiatives operates under strict corporate governance and oversight by its Board, by Catholic Health Initiatives, and by several independent consultants and advisors. *See* AR 211-13, 217-19, 223, 2834, 2878-99, 3084-99, 3332; *see also* Plaintiff's Statement of Material Facts As To Which There Is No Genuine Dispute ("Pl. Stmt.") ¶¶ 38-45, 50-59. For example, First Initiatives' board of directors, which is comprised of Catholic Health Initiatives executives and external members who are insurance experts and

---

[5] For the fiscal year ended June 30, 2009, First Initiatives held $607 million in investments and cash. Paid claims ranged from $60 million to $64 million per year from 2007 to 2009.

leaders from other health care systems, must approve all business plans and investment policies of First Initiatives.  AR 211-13, 2834.  First Initiatives also is subject to regulatory oversight by the Cayman Islands Monetary Authority, which annually approves First Initiatives' business plan and investment policies in accordance with the Authority's established guidelines.  AR 223, 3342-48.

Since First Initiatives was created in 1997, investment allocation studies have been conducted periodically to evaluate the appropriate allocation of investment of First Initiatives assets that will satisfy liquidity needs while maximizing investment return (and in turn reducing premium costs) with an acceptable level of risk.  AR 214-15, 2800-09, 2830-68, 3282-3330; *see also* Pl. Stmt. ¶¶ 50-59.  First Initiatives initially adopted a 40 percent allocation of assets in diversified equity securities, based on the findings by outside investment consultants that conducted a study in 1997, when First Initiatives was first established.  AR 214-15, 2806, 2836-46.

Subsequently, a second study was conducted in February 2000.  That study recommended an increase in First Initiatives' equity allocation from 40 percent to 50 percent of total assets, which First Initiatives adopted.  AR 215, 2848-63, 2880, 2908.  A third asset allocation study, conducted in August 2003, indicated that at expected levels of return, adherence to the investment limitation in the Secretary's Manual would reduce investment income to First Initiatives, and therefore increase

premium cost to Catholic Health Initiatives' hospitals by approximately $38 million over five years.  AR 216-18, 237, 3282-3330.

**D.    Proceedings Below**

Because First Initiatives' investment of assets did not comply with the prescriptions set forth in the Secretary's Manual, the Hospitals voluntarily disclosed this issue and protested the denial of reimbursement for the premium expenses they incurred, in accordance with the procedures established by the Secretary.[6]  AR 241, 279.  By invoking this process, the Hospitals preserved their right to challenge the application of the Manual through appeals.  *See Bethesda Hosp. Ass'n v. Bowen*, 485 U.S. 399, 400-01 (1988); *Athens Cmty. Hosp., Inc. v. Schweiker*, 743 F.2d 1, 5-6 (D.C. Cir. 1984).

The Secretary's contractor - the fiscal intermediary - applied the Manual to deny Medicare reimbursement to the Hospitals for all of the premium assessments

---

[6] After the close of a fiscal year, a hospital submits a cost report to its fiscal intermediary, a private firm that contracts with the Secretary and that is responsible for determining Medicare payments to hospitals.  *See In re Medicare Reimbursement Litig.*, 414 F.3d at 8 (D.C. Cir. 2005).  When a hospital purchases items or services from or through a related parent company, or "home office," the hospital is entitled to reimbursement only for the cost to the home office of the items and services furnished to the hospital.  42 C.F.R. § 413.17; Provider Reimbursement Manual § 2150.  Home offices, therefore, also submit cost reports to the Medicare program.  Provider Reimbursement Manual §§ 2150, 2150.3.  Each hospital's allocable share of the allowable home office costs is then included in each hospital's individual cost report.  The fiscal intermediary then analyzes the cost report and issues a Notice of Program Reimbursement that informs the hospital of the intermediary's final determination of the hospital's Medicare reimbursement for a given cost reporting period.  42 C.F.R. § 405.1803.

they had paid to First Initiatives.[7]  AR 13.  In addition, the fiscal intermediary denied Medicare reimbursement to the Hospitals for all of the claims paid on their behalf by First Initiatives, as well for all of the administrative expenses attributable to the captive insurance program.[8]  AR 242-43, 246-48.

Pursuant to 42 U.S.C. § 1395oo(f), the Hospitals filed an appeal with the Secretary's Provider Reimbursement Review Board ("PRRB" or "Board") for the 1997-2002 cost reporting periods at issue.[9]  The PRRB is an administrative tribunal comprised of five members appointed by the Secretary.  42 U.S.C. § 1395oo(h).

The Board conducted a hearing on November 4, 2004.  AR 186.  Over two years later, the Board majority issued a decision dated January 24, 2007, consisting of two pages of findings of fact and conclusions of law.  AR 11-13.  In a split 3-2 decision, the Board majority denied any reimbursement for the Medicare program's share of the Hospitals' actuarially-determined premium expenses in

---

[7] The estimated amount in controversy exceeds $6 million for the 1997-2002 periods at issue here.  AR 17-38.  This amount represents Medicare's share of the tens of millions of dollars in actuarially-determined premiums paid by the Hospitals to First Initiatives for the periods at issue.

[8] These administrative costs are expenses incurred by Catholic Health Initiatives in day-to-day operation of its risk management program, including salaries of employees who work in the companies offices in Kentucky.

[9] A hospital is entitled to a hearing before the PRRB if the hospital is dissatisfied with an intermediary's determination in a Notice of Program Reimbursement as to the amount of Medicare payment due the hospital for a cost reporting period.  42 U.S.C. § 1395oo(a); 42 C.F.R. § 405.1835.

fiscal years 1997 through 2002.[10]  AR 6-16.  Notably, the three-member Board
majority did not find that premium costs actually incurred by the Hospitals were
unreasonable in amount or were otherwise unrelated to the care of their patients.
*See* AR 11-13.  Rather, the majority opinion instead ruled that premium costs
incurred by the Hospitals were not "proper" because First Initiatives' investment in
equity securities exceeded the Manual's prescriptions on investment by a captive
insurer that is domiciled outside of the United States.  AR 11-12.  The Board
majority also ruled that the Hospitals may not be reimbursed for any of the tens of
millions of dollars in liability claims paid on their behalf during the period at issue.
AR 12-13.

The Board Chair and one other Board member issued a dissenting opinion.
AR 14-16.  The dissenters concluded that the Manual's limitations on investment
by captives domiciled outside the United States "are not an appropriate application
of Medicare statutory reasonable cost principles" and "are not an appropriate
application of Medicare regulatory reasonable cost principles."  AR 15.  The
dissenters concluded that the Manual provision applied by the majority to effect a

---

[10] In the 811 days that elapsed between the Board hearing and issuance of the
Board's decision, the composition of the Board changed.  One of the three Board
members, Yvette C. Hayes, who joined in the majority opinion was not appointed
to the Board until early 2006 and was not present at the hearing conducted in 2004.
In addition, a former Board member, Martin Hoover, who was present at the
hearing conducted in 2004, did not participate in the written decision that was
issued in 2007, after he left the Board.

- 15 -

complete disallowance of all costs relating to the Hospitals' insurance coverage is "devoid of any link to the standards expressed in the regulations in that there is no test relating to reasonableness of premiums."  AR 15.

The Acting Deputy Administrator of the Secretary's Centers for Medicare and Medicaid Services declined to review the Board's January 24, 2007 decision. AR 1.  Thus, the Board's decision constitutes the final decision of the Secretary.

The Hospitals sought judicial review of the Board's decision in the United States District Court for the District of Columbia in a complaint filed March 20, 2007.  On September 30, 2009, the district court issued a memorandum opinion and order affirming the Board's decision.  The district court found that the Board's application of the Manual's investment restrictions does not conflict with the Medicare statute and implementing regulations.  Further, the district court held that the Board's decision was reasonable and based upon substantial evidence in the record.  Finally, the district court rejected the Hospitals' alternative claim for reimbursement for the actual liability claims paid on behalf of the Hospitals.

## SUMMARY OF ARGUMENT

This case presents an instance of the Secretary overreaching her statutory authority in an attempt to regulate the business of insurance - an area she simply has no authority, interest, or expertise in regulating - under the guise of regulating "reasonable cost" reimbursement.  The Secretary's Manual, which prescribes

certain investment limitations that apply only to captive insurers domiciled outside the United States, was applied by the Board majority and the district court to deny reimbursement for *all* of Medicare's fair share of the Hospitals' liability insurance costs. Having disallowed the reimbursement for the premiums paid to the captive, the Secretary then turned around and refused reimbursement for the claims payments made by the captive. There is no denying, however, that there were costs actually incurred and no suggestion that the costs were abnormally high or otherwise unreasonable in normal parlance. Indeed, substantial money was saved by the Hospitals and would have been saved the Secretary, too, if she had paid her fair share of these actual costs of hospital services furnished to Medicare patients.

There is no question that the Medicare statute delegates considerable authority to the Secretary to determine "reasonable cost." *See* 42 U.S.C. § 1395x(v)(1)(A). But, the Manual provision applied in this case has no bearing whatsoever on the necessity, propriety, or reasonableness of the liability insurance premiums incurred by the Hospitals. The Secretary's theory is that the Hospitals' costs were unreasonable, not because they were too high or the insurance unnecessary, but because they were incurred through an affiliate located abroad that invested a higher percentage of its reserves in equities than the Secretary prefers. This is self-evidently an *ultra vires* attempt to regulate matters far removed from the Secretary's authority and expertise. Indeed, it is an extra-

statutory excursion into the business of insurance, the regulation of which is generally reserved to the states and is of no legitimate interest to Medicare in determining a hospital's actual cost of services furnished to Medicare patients.

Putting the *ultra vires* Manual to one side, under the plain language of the Secretary's regulation, the Hospitals are entitled to reimbursement for Medicare's share of the Hospitals' insurance costs because they were "necessary and proper" costs related to patient care and have not been shown to be substantially out of line with the costs of comparable providers. *See* 42 C.F.R. § 413.9; *see also Mem'l Hosp./Adair County Health Ctr., Inc. v. Bowen*, 829 F.2d 111 (D.C. Cir. 1987) ("*Memorial Hospital*") (reversing the Secretary's disallowance of costs not shown to be substantially out of line in accordance with section 413.9(c)(2)).

There is no dispute that liability insurance costs are a "necessary and proper" cost of patient care. *See* Provider Reimbursement Manual § 2160.2 (stating that liability damages that should have been, but were not, covered by insurance are not allowable); *id.* §§ 2162.A, 2162.2.A (noting that liability insurance premiums are allowable costs). Indeed, the Secretary has promulgated rules governing the reasonableness of premiums charged and the types of insurance vehicles that are allowable, and there is no dispute that Catholic Health Initiatives met those requirements. The Hospitals' premiums were actuarially determined, were reason-able in amount, and actually saved millions of dollars for the period at issue. The

Secretary has not, and cannot, meet her burden to show that the Hospitals' costs were substantially out of line with those of comparable providers, which is the Secretary's legitimate role under the statute and regulations.

The burden is on the Secretary to explain why concededly necessary and proper premiums that are reasonable in amount somehow become unreasonable or improper based on the investment decisions of subsidiaries abroad. The Manual provision that the Board applied in this case disallows all liability insurance premiums if a captive domiciled outside the United States invests more than ten percent of its assets in equity securities, but imposes *no limitation* on captives that are domiciled within the United States. That regulation is *ultra vires*. It is also arbitrary and capricious. Absent a reasoned explanation supported by substantial evidence in the record, this disparate treatment is arbitrary and capricious and must be reversed. *See Burlington N. & Santa Fe Ry. Co. v. Surface Trans. Bd.*, 403 F.3d 771, 776-77 (D.C. Cir. 2005).

The answer cannot be that captives domiciled outside the United States are subject to more permissive regulation than those domiciled within the United States. That assumption flies in the face of the undisputed record evidence, which shows that the majority of states do not regulate domestic captives *at all*, and that the minority that do so do not restrict their investment in equities to any fixed percentage of assets. Indeed, the record evidence reflects that First Initiatives'

investment allocation in securities was in line with the average investment allocation of domestic insurers that have similar ownership structure (captives and mutual insurance companies) and underwrite similar types of insurance. The Board's *ipse dixit* approach in deciding this case - that there are "inherent" risks justifying the Manual's investment restrictions simply because the agency says so - is just the type of arbitrary and capricious agency action that has been rejected by this Court. *See D&F Alfonso Realty Trust v. Garvey*, 216 F.3d 1191, 1195-97 (D.C. Cir. 2000) ("*D&F Trust*"). Certainly, unreasoned xenophobia does not satisfy the Administrative Procedure Act.

Finally, even if the Secretary could point to some legitimate source of authority in the statute and regulations for disallowing the premium costs at issue, and even if her decision were otherwise reasonable and based on the record evidence, the Secretary would, at a minimum, need to reimburse the Hospitals for the liability claims paid and related administrative expenses incurred in connection with the Hospitals' insurance program. Medicare's statutory prohibition on cross-subsidization precludes the Secretary from denying reimbursement altogether for the Hospitals' liability insurance costs. *Cf. Saint Mary of Nazareth Hosp. Ctr. v. Schweiker*, 718 F.2d 459, 467 (D.C. Cir. 1983). In denying this alternative claim, the Secretary and the district court read a different provision of the Manual to mean something other than what it actually says, thus depriving the Hospitals of

fair notice of the interpretation of the Manual applied here.  *See Gen. Elec. Co. v. U.S. EPA*, 53 F.3d 1324, 1329 (D.C. Cir. 1995).  The Secretary's failure to reimburse the Hospitals for their claims paid and administrative expenses is also arbitrary and capricious.  The Secretary has failed to offer a reasoned explanation for the inconsistent treatment of the liability insurance costs in this case and the treatment of other types of costs in comparable situations, where Medicare consistently allows for reimbursement on a cash basis when the Medicare program denies reimbursement for expenses incurred on an accrual basis.

## STANDARD OF REVIEW

This Court reviews the district court's grant of summary judgment *de novo*, "'without deference to the decision of the district court.'"  *Se. Ala. Med. Ctr. v. Sebelius*, 572 F.3d 912, 916 (D.C. Cir. 2009) (quoting *Methodist Hosp. of Sacramento v. Shalala*, 38 F.3d 1225, 1229 (D.C. Cir. 1994)).

## ARGUMENT

### A.     The Secretary's Final Decision Exceeds Her Statutory Authority and Is Otherwise Inconsistent with the Medicare Statute and Regulations

A statutory charge to allow reasonable costs surely gives the Secretary substantial discretion to disallow some costs as too high.  But it cannot be construed to grant the Secretary the power to micromanage aspects of hospital operations and management, far removed from considerations of actual cost, on the

ground that some aspect of hospital management deviates from the Secretary's preference. That is, however, precisely what happened here.

No one doubts that premiums were actually paid that were necessary and in line with the reasonable cost of insurance coverage. The Hospitals' supposed fault was not that premiums were too high or unnecessary but that the Secretary considered it improper for an insurer domiciled abroad to invest more than ten percent of its reserves in equity securities.

That sounds *ultra vires*, and it is. The Secretary could equally plausibly deny costs incurred by hospitals for items or services purchased from a vendor that does not recycle or has too large a carbon footprint. Neither the Secretary's authority nor her expertise extends to insurance investment risk or the regulation of insurance, which is generally reserved by Congress for regulation by the states. Accordingly, the Secretary's decision should be set aside. *See* 5 U.S.C. § 706(2)(C) (directing a reviewing court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . in excess of statutory jurisdiction, authority, or limitations).

In its analysis under *Chevron* step one,[11] the district court found that the Manual's investment restrictions were not contrary to the plain language of the statute "[b]ecause the Medicare statute, by its terms, does not say whether

---

[11] *See Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837 (1984).

insurance premiums paid to captive insurers that are domiciled offshore and invest more than ten percent of their assets in equity securities are reimbursable." *Catholic Health Initiatives*, slip op. at 9. Of course it does not. But the fact that the Secretary's Manual addresses issues light years removed from the object of the authorizing statute makes her actions *ultra vires*, not the subject of delegated authority. The district court's analysis utterly misses the point that the Manual's investment restrictions have no bearing on the reasonableness of insurance costs actually incurred by the Hospitals. The Manual's restrictions are directed at the reasonableness of investments by an insurer that furnished coverage to them, an area the Secretary has no authority, expertise, or interest in regulating under the relevant statutes.

The Medicare statute defines "reasonable cost" as "the cost actually incurred" in the efficient delivery of necessary health services. 42 U.S.C. § 1395x(v)(1)(A). That text makes clear that the Secretary's inquiry into "reasonableness" is to be focused on whether costs were unnecessary or too high. It is not an invitation for the Secretary to opine on the reasonableness or propriety of management policies unrelated to costs. The intent of the statute, and the Secretary's implementing regulation, is to provide for the payment of a hospital's actual costs related to patient care, however widely they may vary, subject only to a limitation on costs that are shown to be "substantially out of line" with the costs

incurred by comparable health care providers for similar services. *See* S. Rep. No. 89-404 (1965), *reprinted in* 1965 U.S.C.C.A.N. 1943, 1976; 42 C.F.R. § 413.9. The statute authorizes the Secretary to promulgate regulations governing the "method or methods to be used, and the items to be included, in determining" reasonable cost. 42 U.S.C. § 1395x(v)(1)(A). This provision of the statute delegates considerable authority to the Secretary, but her authority is limited to determining whether a given cost - not whether every policy of the entity generating the cost - is reasonable. *See id*.; *see also* 42 U.S.C. § 1395 (prohibiting the Government from exercising "supervision or control over the administration or operation of any" provider of services under the Medicare program). The fundamental objective of the statute is that the Secretary must ensure the one thing that she most certainly has not ensured here, that the Medicare program bears its fair share of the direct and indirect costs of services furnished to Medicare patients. *See* 42 U.S.C. § 1395x(v)(1)A); *see also* 42 C.F.R. § 413.9(b).

The district court misunderstood the Hospitals' argument in this regard. The Hospitals do not contend that "*any and all* costs actually incurred by a hospital must be reimbursed." *Catholic Health Initiatives*, slip op. at 9 (emphasis in original); *see also id.* at 8. Nor do the Hospitals contend "that the only basis for disallowing costs actually incurred is that the costs were too high." *Id.* at 9. Plaintiffs recognize that the Secretary has broad - but not unfettered - authority

under the statute to determine reasonable costs. *See* 42 U.S.C. 1395x(v)(1)(A) (delegating authority to the Secretary to promulgate regulations governing the "method or methods to be used, and the items to be included, in determining" reasonable cost). But the focus must always remain on the costliness or necessity of the services provided, and not the reasonableness of the polices or investment decisions of the hospitals or their vendors.

The Secretary's decision in this case, therefore, is inconsistent with the plain language and intent of the statute and implementing regulation governing the determination of a hospital's reasonable cost related to patient care. The regulation provides that "reasonable cost includes all necessary and proper costs incurred in furnishing the services," 42 C.F.R. § 413.9(a), and it broadly defines the term "necessary and proper costs" to include costs that are "common and accepted occurrences in the field of the provider's activity." 42 C.F.R. § 413.9(b)(2).

The fundamental problem with the Secretary's approach here is that the investment restrictions micromanaging equity holdings and the choice between dividend and non-dividend paying equities have no bearing whatsoever on the reasonableness or necessity of liability insurance costs actually incurred by the Hospitals. The Manual's investment restrictions have nothing to do with whether liability insurance premiums are necessary in the efficient delivery of necessary health services. *See* 42 U.S.C. § 1395x(v)(1)(A). Nor do they have anything to do

with determining whether the liability insurance costs are "appropriate and helpful" or "common and accepted." *See* 42 C.F.R. § 413.9(b). Other provisions do this work by ensuring that costs are not out-of-line with the market. The Manual provision at issue here is not directed at the Hospitals' costs at all. It is directed to an *insurer's* investment of its assets in equity securities. And, as the dissenting opinion at the PRRB noted, the Manual's investment restrictions, therefore, are "devoid of any link to the standards expressed in the regulations in that there is no test relating to reasonableness of premiums." AR 15.

There is no dispute that liability insurance costs are a necessary and proper cost of patient care for a hospital. *See Walter O. Boswell Mem'l Hosp.*, 749 F.2d at 799 (noting that the Secretary "considers malpractice insurance for Medicare patients necessary and thus compensable"); *LGH, Ltd. v. Sullivan*, 786 F. Supp. 1047, 1053 (D.D.C. 1992) (holding that assessments voluntarily paid by hospitals to a state fund for incurred but not reported malpractice losses are necessary costs related to patient care); Provider Reimbursement Manual § 2160.2 (stating that liability damages that should have been, but were not, covered by insurance are not allowable); *id.* §§ 2162.A, 2162.2.A (noting that liability insurance premiums are allowable costs). Malpractice insurance costs are a "common and accepted occurrence in the hospital industry" and "they occur regularly in the normal course of hospital business." *See Gateway Cmty. Hosp. v. Blue Cross and Blue Shield*

*Ass'n / Blue Cross and Blue Shield of Fla.*, PRRB Dec. No. 92-D50, Medicare & Medicaid Guide (CCH) ¶ 40,834 (Aug. 20, 1992).  Indeed, the Secretary's own witness admitted that liability insurance costs are "common and accepted." AR 274.

Thus, there is also no question that the insurance premium expenses are necessary and proper.  The only remaining question, then, should be reasonableness of the amount of the premium expenses that the Hospitals incurred.  The Secretary has issued Manual provisions governing that question.  The Secretary's Manual provides, for example, that premium costs incurred to obtain coverage through a captive insurer are allowable "if they are not in excess of the cost of available comparable commercial insurance premiums."  *See* Provider Reimbursement Manual § 2162.2.

There is no dispute that the actuarially-determined premium costs incurred by the Hospitals in this case were reasonable in amount and related to the care of their patients.   AR 12, 213, 241-42, 3107; *see also* Provider Reimbursement Manual § 2162.2.A (requiring that in setting premiums, captives must take into account "the excess of actuarially determined loss reserves and related operating expenses over actual losses and related operating expenses and gains and losses from investments"); *see also* Provider Reimbursement Manual § 2162.C (requiring that when the type of insurance changes, provider must document that premiums

- 27 -

are based on an "actuarial determination . . . of anticipated losses for malpractice" and other liabilities).  Indeed, a study by an independent outside consultant, Aon, demonstrates that Catholic Health Initiatives saved nearly $15 million for fiscal year 2000 as compared to the costs that it would have incurred to purchase comparable insurance from a commercial insurer.  AR 218-19, 2870-71.

But the Manual provision at issue here goes much further.  It is specifically aimed at insurance investment risk-taking by the Hospitals' affiliated insurance vendor.  By the agency's own admission, the Manual provision is intended to ensure that captives domiciled outside the United States "prudently manage their investments."  AR 250, 252, 260.  That admission takes the Secretary far from her statutory authority and core competence.  Indeed, the admission takes her simultaneously into two disfavored areas.  First, it makes clear that she is regulating not reasonable costs of patient care, but the business of insurance, the regulation of which is generally reserved to the states by the McCarran-Ferguson Act.  *See* 15 U.S.C. § 1012; *Group Life & Health Ins. Co. v. Royal Drug Co.*, 440 U.S. 205, 211-12 (1979) (noting that the underwriting or spreading of risk and investment risk-taking on the part of the insurer are central to the concept of "insurance").  Second, it involves extraterritorial regulation, the authority for which is generally conferred only by a clear statement of Congressional intent that

is entirely lacking in the Medicare statute.  *See, e.g., Equal Employment Opportunity Comm'n v. Arabian American Oil Co*., 499 U.S. 244, 248 (1991).

As to the former, the Secretary's application of her Manual provision in this case is an interference with the relationship between the insurer, First Initiatives, and its insureds, the Hospitals.  That relationship is a central aspect of the business of insurance, the regulation of which, as noted above, is generally reserved to the states.  *See SEC v. Nat'l Securities, Inc.*, 393 U.S. 453, 460 (1969) (noting that while it is not exactly clear what Congress meant by "'business of insurance,'" "it is clear where the focus was - it was on the relationship between the insurance company and the policyholder").

Insofar as the Manual is intended to regulate these central aspects of the business of insurance - the underwriting of risk and investment risk-taking and the relationship between an insurer and its insured - it moves well beyond the Secretary's statutory authority to establish regulations identifying the reasonable costs of services furnished to Medicare patients and should be set aside pursuant to the Administrative Procedure Act, 5 U.S.C. § 706(2)(C).  *See Health Ins. Ass'n of Am., Inc. v. Shalala*, 23 F.3d 412, 419 (D.C. Cir. 1994) (noting that an "authoritative interpretation" of a regulation would still be invalid if it exceeded the agency's statutory authority).

In addition to being an area that Congress never intended the Secretary to regulate, the Secretary has no legitimate interest (let alone expertise) in how a captive insurer invests the premiums that a hospital has paid to it. The Secretary's interest in determining whether insurance premium expenses are reasonable ends when a hospital has *incurred* an actuarially-determined premium expense, as here, for the purpose of purchasing a recognized form of liability insurance. *See* 42 U.S.C. § 1395x(v)(1)(A) (defining "reasonable cost" as the cost "actually incurred" in the efficient delivery of necessary health services); 42 C.F.R. § 413.9(a) (stating that "reasonable cost includes all necessary and proper costs incurred" in furnishing services).

The Secretary simply has no legitimate downstream interest in the investment policies of the payee. The risk of non-payment by the insurer, which appears to be the only conceivable basis for the Secretary's limitations, rests with the Hospitals, not the Medicare program. The Medicare program does not reimburse hospitals on the back end for the costs of liability claims made against them when the program has already reimbursed the hospital on the front end for the insurance premium expense. *See* Provider Reimbursement Manual § 2162.13 (providing that where a hospital has no malpractice insurance protection, Medicare will not make payment for any losses incurred with respect to malpractice claims).

- 30 -

The following example illustrates this point. Assume that two Hospitals pay actuarially-determined liability insurance premiums to two captives that are domiciled within the United States and, therefore, are *not* subject to the investment restrictions in the Secretary's Manual. One of the captives invests fifty percent of its assets in diversified equity securities, as the Secretary permits,[12] while the other captive throws all of its assets into the stock of a single company that ultimately goes bankrupt, which the Secretary also permits. *See infra* at 47-48. All other factors being equal, the Medicare program will pay the two hospitals the same amount based on the malpractice premiums incurred by them and *not* different amounts based on the liability claims paid by the hospital because its insurer failed. Thus, in both situations, the hospitals' reimbursement would be limited to Medicare's share of the premiums incurred. What an insurer does with malpractice insurance premiums once received from a hospital does not bear upon the reasonableness of the costs incurred by a hospital to purchase coverage and has no impact whatsoever on the costs that are actually reimbursed by Medicare. As illustrated in the preceding example, the Secretary's insurance investment restrictions simply have nothing to with the necessity, propriety, or reasonableness of costs incurred to purchase insurance from a captive insurer.

---

[12] As noted above, the Secretary prescribes no limit on an investment by a captive insurer that is domiciled within the United States.

Thus, *Shalala v. Guernsey Memorial Hospital*, 514 U.S. 87 (1995) ("*Guernsey*"), is inapposite here because the decision at issue in *Guernsey* was not inconsistent with the Secretary's regulation. *See id.* at 100. In that case, the Court agreed that "rulemaking would still be required if the [Manual] adopted a new position inconsistent with any of the Secretary's existing regulations."[13] *Id.* In contrast, the Manual provision applied here *is* inconsistent with the Secretary's reasonable cost regulation.

Further, even if the Board majority had properly concluded that the Manual's investment limitations were a permissible interpretation of "proper" as used in the Secretary's reasonable cost regulation (which they did not), the application of those investment restrictions in this case would be invalid, because it far exceeds the Secretary's authority under the statute to establish regulations and methods for determining reasonable costs related to patient care. *See Health Ins.*

---

[13] Though the Forward to the Secretary's Manual states that it sets forth guidelines that lack the force or effect of regulations, this "boiler-plate" does not change the nature of the Manual provision prescribing specific limitations on investment by a captive insurer that is domiciled outside of the United States. *See Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1023 (D.C. Cir. 2000). Like the agency "guidance" at issue in *Appalachian Power*, the Manual provision at issue here "commands, it requires, it orders, [and] it dictates." *Id.* (concluding that EPA guidance was final agency action). As such, the Manual provision restricting insurance investments is a legislative rule, subject to the notice and comment rule making procedure prescribed by the Administrative Procedures Act, 5 U.S.C. § 553. *Cf. id.* at 1024 (in determining whether a rule is interpretive, "[w]e must still look to whether the interpretation itself carries the force and effect of law,…or rather whether it spells out a duty fairly encompassed within the regulation that the interpretation purports to construe").

*Ass'n of Am., Inc.*, 23 F.3d at 419 (noting that an "authoritative interpretation" of a regulation would still be invalid if it exceeded the agency's statutory authority). The Medicare statute simply does not give the Secretary authority to supervise or control investment strategy or otherwise police the reasonableness of management policies of payees. Thus, the district court's reliance on *Guernsey* was misplaced. *See Catholic Health Initiatives*, slip op. at 14.

The law in this circuit is clear. The Secretary's Manual does not trump the plain language of her regulation. *See* Provider Reimbursement Manual Foreword (noting that the Manual does not "have the effect of regulations"). In *Memorial Hospital / Adair County Health Ctr. v. Bowen*, 829 F.2d 111 (D.C. Cir. 1987), the Secretary disallowed reimbursement for Medicare providers' pharmacy and therapy costs that were not shown to be substantially out of line with costs incurred by similar providers for comparable services. In that case, the Secretary invoked another section of the same Chapter 21 of the Manual, at issue here, to effect the disallowance of the providers' actual costs because they had not shown that they met the Manual's "prudent buyer" requirements when they decided to purchase those services. This Court held that costs actually incurred by a Medicare provider must be allowed so long as they are "necessary and proper" and not proven by the Secretary to be "substantially out of line" in accordance with the plain meaning of the regulation at 42 C.F.R. § 413.9, and regardless of whether the costs satisfied

the additional "prudent buyer" standard articulated in the Secretary's Manual. *Memorial Hospital*, 829 F.2d at 118; *see also* 42 C.F.R. § 413.9(c)(2) (stating that the payment of reasonable costs is "intended to meet the actual costs, however widely they may vary from one institution to another . . . subject to a limitation if a particular institution's costs are found to be substantially out of line with other [comparable] institutions").

Similarly, here too, the Secretary's application of the Manual's investment restrictions to disallow the Hospitals' malpractice insurance premium costs is invalid and must be reversed. The costs were necessary and the Secretary has not shown that they were out of line. *See* AR 16, 216-19, 2846, 2870-71, 3294-95.

Indeed, the undisputed evidence shows that the Hospitals' costs were, if anything, lower than those of comparable providers. *See* AR 16. At a minimum, the undisputed record evidence shows that at every step, beginning with the inception of the captive insurance program, the Hospitals were diligent to ensure that their captive insurance program operated in a careful, prudent, and cost-effective manner. *See supra* at 11-12.

Further, the evidence shows that Catholic Health Initiatives and the Hospitals saved millions of dollars in insurance costs for the periods at issue because the captive's prudent investments increased expected rates of return and thus reduced premium assessments necessary to cover actuarially determined loss-

- 34 -

costs.    AR 216-19, 2846, 2870-71, 3294-95.    For example, a study by an independent outside consultant demonstrates that Catholic Health Initiatives saved nearly $15 million for fiscal year 2000 as compared to the costs that it would have incurred to purchase comparable insurance from a commercial insurer.  AR 218-19, 2870-71.  Similarly, the undisputed evidence also shows that adherence to the Manual's investment restrictions for the periods at issue would likely have reduced investment returns - and thus *increased* premium expenses (*i.e.*, reimbursable costs) - by $38 million over a five year period.  AR 216-18, 237, 3294-95.  Thus, the undisputed evidence shows that, far from being substantially out of line, the Hospital's insurance premiums represented a substantial *savings* to the Medicare program.

Tellingly, the district court's decision does not address this Court's decision in *Memorial Hospital* head-on.  Rather, the district court sidestepped that precedent by noting that "occasionally" the Secretary's refusal to reimburse certain costs have been overturned by the court.  The district court further noted that "these decisions do not warrant the conclusion that the Medicare statute's plain language mandates that *any and all costs* actually incurred by a hospital must be reimbursed."  *Catholic Health Initiatives*, slip op. at 9 (emphasis in original).  True enough, but the district court's opinion again failed to address the relevant question.

- 35 -

The relevant question on this point is not whether "*any and all costs*" should be reimbursed. The question is whether necessary and proper costs that have not been shown by the Secretary to be substantially out of line should be reimbursed. Under this Court's decision in *Memorial Hospital*, the answer is unequivocally yes.

\*      \*      \*

In the end, the district court not only lost sight of *Memorial Hospital*, but also lost sight of the forest for the trees. The Secretary of Health and Human Services lacks the authority to micromanage the investment decisions of insurers at the level of preferring dividend-paying stocks over equity shares in companies that reinvest earnings in the business. It is hard to imagine an issue further removed from the Secretary's core competence, or a subject that would be off-limits to the Secretary, if her seemingly modest authority to police costs to ensure reasonableness is actually a license to oversee the operations of payees to maintain compliance with the Secretary's favored view of what is reasonable, sound, proper and prudent.

## B.   The Secretary's Decision Is Not Supported by Substantial Evidence in the Record

Even if the Secretary has the authority to regulate the investments of a captive insurer domiciled outside of the United States by virtue of her statutory authority to determine the reasonable costs of services furnished by a provider, she still must exercise that authority reasonably, based on substantial evidence in the

record, and not arbitrarily and capriciously. *See* 5 U.S.C. § 706(2)(A) & (E) (requiring a reviewing court to set aside agency action that is arbitrary and capricious or unsupported by substantial evidence in the record).

The Secretary fails that standard here. As articulated by the Supreme Court, the test for arbitrary and capricious agency action involves a careful, searching inquiry as to whether:

> the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n of the U. S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) ("*State Farm*").

The Board majority did not engage in anything remotely resembling reasoned decision-making in this case. The majority's decision failed even to acknowledge the undisputed record evidence, let alone to weigh that evidence, in applying the Secretary's Manual provision to the Hospitals. As discussed below, the testimony of the Secretary's own witness before the PRRB underscores the agency's lack of experience or competence in regulating insurance investments and shows that no substantial evidence supports the investment restrictions applied here. Indeed, the Secretary's witness admitted "it's probably time for Medicare to revisit the manual procedures." AR 275-76.

- 37 -

As noted above, the Secretary's Manual applies restrictions on the investments of captive insurers domiciled outside the United States, but imposes no limit on the investments of a captive insurer domiciled within the United States. The Secretary, therefore, must supply a "reasoned explanation" for this dissimilar treatment. *See, e.g.*, *Transactive Corp. v. United States*, 91 F.3d 232, 234, 241 (D.C. Cir. 1996) (finding that the Department of Treasury failed to provide a "reasoned explanation" for treating the agency's Electronic Benefits Transfer program differently from other forms of electronic funds transfers). And, the Secretary's explanation for its disparate treatment must be reasonable and supported by "substantial evidence in the record." *See Burlington N. & Santa Fe Ry. Co. v. Surface Trans. Bd.*, 403 F.3d 771, 776-77 (D.C. Cir. 2005); *see also Petrol. Commc'ns, Inc. v. FCC*, 22 F.3d 1164, 1172 (D.C. Cir. 1994); *Garrett v. FCC*, 513 F.2d 1056, 1060 (D.C. Cir. 1975).

In determining that the PRRB's application of the Manual's investment restrictions was reasonable and based on substantial evidence in the record, the district court grounded its decision in the PRRB's "concern that offshore captives 'are not subject to the same level of industry regulation applied to onshore agencies by State insurance companies' and thus are inherently more risky." *Catholic Health Initiatives*, slip op. at 11. This finding flies in the face of the undisputed

record evidence that the level of state regulation of equity investments by domestically domiciled captives is essentially zero.

The district court, for example, concluded that "the ten percent limitation was in line with general state practice." *Catholic Health Initiatives*, slip op. at 11. That is categorically not true. The undisputed evidence, discussed below, shows that at least forty-four states impose *no* fixed limits on investment allocations by captive insurers. And, there is no affirmative evidence in the record showing that any of the remaining six states impose any fixed limit on investment allocations by a captive.

As such, the district court should have reversed the PRRB because it "offered an explanation for its decision that runs counter to the evidence." *See State Farm*, 463 U.S. at 43; *see also Nat'l Fuel Gas Supply Corp. v. FERC*, 468 F.3d 831, 839 (D.C. Cir. 2006) (invalidating agency action where agency's claimed reasoning for its action was contradicted by the record evidence and finding that theoretical rationale was insufficient to support agency action); *BellSouth Telecomm., Inc. v. FCC*, 469 F.3d 1052, 1058-60 (D.C. Cir. 2006) (although an agency's "predictive judgments" are entitled to deference, they must still be overturned if the agency fails to support its decision with record evidence); *Morall v. Drug Enforcement Admin.*, 412 F.3d 165, 178 (D.C. Cir. 2005) (an agency's decision cannot withstand review when the decisionmaker entirely

ignored relevant evidence in the record); *Lakeland Bus Lines, Inc. v. NLRB*, 347 F.3d 955, 962 (D.C. Cir. 2003) (an agency's decision is not based upon substantial evidence if it "fails to take account of contradictory evidence and is not supported on the record as a whole"); *Chem. Mfrs. Ass'n v. EPA*, 217 F.3d 861, 865-66 (D.C. Cir. 2000) (agency action was arbitrary and capricious where the agency not only failed to show a rational connection between the facts found and the choices made, but also offered an explanation that ran counter to the evidence in the record).

Neither the PRRB nor the district court fairly considered the record evidence.  The record evidence shows that state insurance regulators apply differing limitations, or no limitations at all, on investments by insurers, depending upon the ownership structure of the insurer that is being regulated and the type of risk that is being underwritten by the insurer.  *See* AR at 264-68, 270, 3334-35, 3337-38, 3370, 3381, 5495-5503, 5505-12, 5514-16, 5518-19, 5521-24.

That undisputed record evidence further shows that the vast majority of states impose no fixed restrictions on investment allocations by a captive insurer. At the hearing before the PRRB, the Secretary's witness testified that to her knowledge, only a minority of states - twenty-three - regulate captive insurers at all.  AR 254.  Further, the great majority of the twenty-three states that regulate captives *do not* prescribe any fixed limits on the allocation of investments by a captive insurer.  AR 15-16, 147-48, 203-04, 207, 220-22, 270.  In Vermont, for

example, where the majority of domestic health care captives are domiciled, there are no fixed limits whatsoever on a captive's allocation of investments. AR 220-21, 270; *see also* Vt. Stat. Ann. tit. 8, § 6010(b) (2002), AR at 3334-35 ("No pure captive insurance company . . . shall be subject to any restrictions on allowable investments whatever . . . provided, however, that the commissioner may prohibit or limit any investment that threatens the solvency or liquidity of any such company"). Not only Vermont, but at least sixteen of the twenty-two remaining states that regulate captives at all impose no fixed limits on a captive's allocation of investments.[14] Further, neither the PRRB's decision below nor the Secretary's briefs before the district court identified *any* state that imposes a fixed limit on a captive's investments in equity securities, let alone one that precludes investment in non-dividend yielding equities, and the Hospitals are not aware of any.

There is simply no evidence in the record to support the PRRB's conclusion that captives domiciled outside the United States are "not subject to the same level

---

[14] *See* Arizona, Ariz. Rev. Stat. Ann. § 20-1098.10.B (2007); Arkansas, Ark. Code Ann. § 23-63-1610(b)(1) (West 2007); Colo. Rev. Stat. Ann. § 10-6-121(2)(a) (West 2003), AR 3337-38; Delaware, Del. Code Ann. tit. 18, § 6910(b) (West 2007); Georgia, Ga. Code Ann. § 33-41-18(2) (West 2007); 215 Ill. Comp. Stat. 5/123C-12 (2004), AR 3381; Kansas, Kan. Stat. Ann. § 40-4310 (West 2007); Kentucky, Ky. Rev. Stat. Ann. § 304.49-100(2) (West 2007); Montana, Mont. Code Ann. § 33-28-202(2) (West 2007); Nevada, Nev. Rev. Stat. Ann. § 694C.340(2) (West 2007); New York, N.Y. Ins. Law, § 7009(a) (McKinney 2007); Oklahoma, Okla. Stat. Ann. tit. 36, § 6470.15.B (West 2007); South Carolina, S.C. Code Ann. § 38-90-100(B) (2007); South Dakota, S.D. Codified Laws § 58-46-19 (2007); Utah, Ut. Code Ann. § 31A-37-302(2)(a) (West 2007); West Virginia, W. Va. Code Ann., § 33-31-10(b) (West 2007).

of industry regulations" as those that are domiciled within the United States.  AR
11.  To the contrary, the evidence shows that, like the Cayman Islands Monetary
Authority, the states that regulate captives domiciled in their jurisdictions generally
allow considerable flexibility in the investment of a captive's assets and determine
on a case-by-case basis whether a particular investment allocation may threaten
solvency or financial health.  AR 220-23, 3342-48; *see also* Colo. Rev. St. Ann.
§ 10-6-121(2)(a), AR 3337-38; Vt. Stat. Ann. tit. 8, § 6010(b), AR 3334-35.  States
take this approach because they have less concern about promoting policyholder
confidence in a captive insurance company, like First Initiatives, where
policyholders and shareholders have a commonality of interest.  AR 221-22, 3343.
Even the Secretary's witness admitted on cross-examination that she "can't speak
definitively" as to any substantive difference between the oversight and regulation
of a captive insurer domiciled in the Cayman Islands and the oversight and
regulation of a captive insurer domiciled in a state such as Vermont.  AR 262.

In upholding the Board's decision, however, the district court referred to
evidence that it characterized as showing that "when restricted to the relevant
insurance industries, medical malpractice and workers compensation, domestically
domiciled insurance companies' average equity investment allocation ranged from
7.82% to 9.37% or 11.89% to 14.43%, respectively, over a five year period."

*Catholic Health Initiatives*, slip op. at 11-12.  This is the *only* evidence that the PRRB relied upon in its decision.  AR 11-13.

The district court's and the Board's reliance on this statistic is clear error. Comparing the average equity investment allocation of *all* malpractice and worker's compensation insurers to a *captive* insurer is like comparing apples to oranges.  The fact that the average investment allocations for *all* malpractice and worker's compensation insurers is in the general vicinity of ten percent does not show a "general state practice" to restrict the investment allocations of *captive* insurers to ten percent or any other amount.  For that matter, even if this statistic related to truly comparable entities - domestic captives (and it does not), the evidence of their average  equity investments does not go to show anything about a "general state practice" limit to investment in equities by  that category of insurer.

In reality, the record evidence shows that states regulate insurers based not only upon the type of insurance that they offer but also based upon the ownership structure of the insurer.   Indeed, the record evidence shows that for mutual insurance companies that underwrite property and casualty risks for the policyholders that own them - like the captive insurer at issue here - the average investment allocation in equity securities ranges from 44.38 to 51.78 percent. AR 270-73, 3388.

Thus, the Manual's limitation is not remotely in line with the average investment allocation by domestic insurers that are truly comparable to First Initiatives in terms of ownership structure and the types of insurance that they underwrite.[15] *Cf. Memorial Hospital*, 829 F.2d at 333 (finding that the reasonable cost regulation requires that the Secretary "arrive at truly comparable bases for comparison in determining whether the actual costs of a particular provider are out of line"). Further, First Initiatives' forty to fifty percent investment allocation in securities for the time periods at issue here *is* in line with the 45.38 to 51.78 percent average for mutual insurance companies regulated by the states.

In ruling against the Hospitals, the district court noted that "the Board did not delve deeply into the relative regulatory environments between the various states and between the various states and foreign governments." *Catholic Health Initiatives*, slip op. at 12. This is an understatement. The district court nonetheless found that the Board majority's decision "is reasonable," noting the majority's conclusion that "plaintiffs did not provide evidence that would have led [the PRRB] to conclude that the investment restrictions were 'inappropriate or unreasonable.'" *Catholic Health Initiatives*, slip op. at 12. To the contrary, the

---

[15] The district court also noted that there was hearing testimony indicating that "liquidations of captive insurers increased by fifty percent between 2001 and 2002." *Catholic Health Initiatives*, slip op. at 11. Even if this were true, it lends no support to the Board's conclusion that captives domiciled outside the United States are riskier than captives domiciled within the United States.

record evidence shows that the Secretary's investment restrictions were ill-conceived from the beginning and are unsupported by the record evidence presented in this case. In addition to the evidence discussed above, the record evidence also shows that adherence to the Manual's investment restrictions would have been expected, during the period at issue, to reduce investment returns, and thus increase premium expense, by approximately $38 million over a five-year period. AR 216-18, 237, 3282-3330. Further, the record evidence shows that the Manual requires no diversification at all in a captive's investments, AR 261, which could result in very risky investments. This evidence and more was before the PRRB, but both the Board majority's and district court's decisions ignored it, instead basing their decisions on an unsubstantiated - indeed, demonstrably false - premise that captives domiciled outside of the United States are not subject to the same level of regulation applied to domestic captives.

At the PRRB hearing, the Secretary's principal witness testified that the Manual's limitation was based on some unspecified "research" into state restrictions on investment. AR 250, 259-60. On cross-examination, however, the Secretary's witness admitted that she had never seen that "research" and did not know what it found, if anything. AR 260. The witness also admitted that neither she nor her predecessor had experience with insurance underwriting, the regulation of the business of insurance, or investment risk. AR 258-60. The witness further

admitted that she could not identify any factors considered by the Secretary in connection with the establishment and continuing application of the investment limitation in the Secretary's Manual.  AR 266, 272-73.

The evidence is clear that state insurance regulators apply differing limitations, or no limitations at all, on investments by insurers, depending upon the type of insurer being regulated and the type of risk that is being underwritten by the insurer.  *See* AR at 264-68, 270, 3334-35, 3337-38, 3370, 3381, 5495-5503, 5505-12, 5514-16, 5518-19, 5521-24.  The Secretary's witness, however, was unable even to identify the differences between the types of risk underwritten by an insurance company - life and health versus property and casualty - that lead state regulators to adopt differing limitations on investments by insurers underwriting different types of insurance risk.  AR 263, 266-67.  Similarly, the Secretary's witness was unable to identify the differences between different types of insurers - commercially-licensed versus a captive or mutual insurance company - that lead state regulators to adopt different limitations on investments by these companies.  AR 263-65, 272-73.  Ultimately, the witness admitted that the differences in state regulations governing different types of risk insurance and different types of insurers do not "really make much sense to me" because she is "not a specialist" in the area of insurance regulation or risk.  AR 266.

Finally, if the application of the Manual's investment limitation is intended "to promote solvency and ensure the financial strength of the insurer," as stated in the Secretary's briefs before the district court,[16] the undisputed record evidence shows that the Manual guideline is not rationally tailored to meet that objective. *See State Farm*, 463 U.S. at 43 (noting that an agency must "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made'"), quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962). Rather, the record evidence reflects that the Manual's investment limitations are both over-broad and under-inclusive. The Manual precludes any investment in the stock of a company that does not pay dividends, for example, but there is no evidence showing any correlation between the payment of dividends and the financial strength of a company.[17] AR 260-61. Conversely, the Manual does not require any degree of diversification in a captive's investments. AR 261. Indeed, at the hearing, the Secretary's witness admitted to not even knowing whether there is any correlation between diversification and risk. AR 261. But federal statutes actually directed to investment risks - as opposed to reimbursement for costs of medical services

---

[16] *See* Memorandum of Points and Authorities in Support of Defendant's Motion for Summary Judgment and in Opposition to Plaintiffs' Motion for Summary Judgment at 15; *see also* AR 250.

[17] During the period at issue at issue, Microsoft, for example, did not pay dividends, but was a very sound investment.

furnished to hospital patients - make clear that there is a risk associated with lack of diversification in investments. *See* 29 U.S.C. § 1104(a)(1)(C) (while not limiting investment in securities, the ERISA statute mandates that an ERISA plan fiduciary must "diversify[] the investments of the plan so as to minimize the risk of large losses").

Rather than engaging in anything resembling the reasoned analysis required in this circuit, *see D&F Trust*, 216 F.3d at 1195-97, the Board majority took an *ipse dixit* approach in deciding the outcome of this case: there are "inherent" risks justifying the Manual's investment restrictions on captive insurers domiciled outside the United States simply because the agency says so. But there is nothing in the record to substantiate that foreign regulation is inferior, and xenophobia is no substitute for reasoned decision making. Moreover, this Court has found that such an *ipse dixit* approach does not hold water. *Id.* at 1196-97. Rather than considering the regulation of insurance in its entirety, *see id.* at 1196, the Board completely ignored a number of important aspects of the problem in this case.

In the end, the shoddiness of the Board's reasoning and the glaring deficiencies in the Agency's witness testimony only underscore that the Secretary has strayed too far from her area of competence. It is not shocking that employees in the Department of Health and Human Services lack expertise in regulating captive insurers and their investments. That agency does not need that expertise to

perform its statutory responsibilities in administering the Medicare program. However, it is shocking, and *ultra vires*, as well as arbitrary and capricious, that despite that lack of expertise, the agency would engage in misguided insurance regulation under the guise of monitoring costs of hospital services for reasonableness.

**C.    The Secretary Must, at a Minimum, Reimburse the Hospitals for Medicare's Share of the Claims Paid and Administrative Expenses of the Hospitals' Insurance Program**

Even if the Secretary could point to some legitimate basis of authority in the statute and regulations (which she cannot) for disallowing the premium costs at issue, and even if her decision were otherwise reasonable and based upon the record evidence (which it is not), neither the PRRB nor the district court has posited any valid reason for their decisions to disallow reimbursement for the Hospitals' liability coverage costs altogether.  Indeed, having found that the Hospitals' liability *premiums* were not allowable pursuant to the Secretary's Manual, it was arbitrary and capricious for the Secretary to deny the Hospitals reimbursement, at a bare minimum, for Medicare's fair share of the actual *claims paid* and the administrative expenses of the Hospitals' captive insurance and risk management program.  *See* 42 U.S.C. § 1395x(v)(1)(A).  There is no question that 1) actual premiums were paid by the Hospitals and 2) actual claims were paid on

their behalf by First Initiatives. Yet, under the PRRB's and district court's decisions, the Hospitals have been denied reimbursement for both.

The denial of *all* of the Hospitals' liability costs, premiums and claims paid, is contrary to the Medicare statute's prohibition on cross-subsidization. The prohibition on cross-subsidization provides that in establishing regulations for the determination of reasonable costs, the Secretary must ensure that

> under the methods of determining costs, the necessary costs of efficiently delivering covered services to individuals covered by the insurance programs established by this subchapter [*i.e.*, the Medicare Act] will not be borne by individuals not so covered, and the costs with respect to individuals not so covered will not be borne by such insurance programs.

42 U.S.C. § 1395x(v)(1)(A). Although neither the PRRB nor the district court even acknowledge it, this Court has interpreted the statutory proscription against cross-subsidization to preclude the Secretary from determining that a hospital "would not be reimbursed at all for the costs of rendering care to Medicare patients." *See Saint Mary of Nazareth Hosp. Ctr. v. Schweiker*, 718 F.2d 459, 467 (D.C. Cir. 1983). Yet, that is precisely the result here under the terms of the PRRB's and district court's decisions.

Further, in denying reimbursement to the Hospitals for their claims paid and administrative expenses, both the district court and the Board majority relied on another provision in Chapter 21 that is inapplicable here by its own terms. Quoting from this provision, the Board majority wrote: "[Manual] § 2162.13 states that

'where a provider has no insurance protection for malpractice or comprehensive general liability in conjunction with malpractice, either in the form of a limited purpose [*i.e.*, captive] or commercial insurance policy or a self-insurance fund . . . , any losses and related expenses incurred are not allowable.'" AR 12-13. But by its plain terms, this provision applies only when a provider "has no insurance protection." Provider Reimbursement Manual § 2162.13. And there is no dispute that the Hospitals had liability insurance protection through their captive insurer.

In upholding the PRRB's decision, the district court also construed the Manual to mean something different from what it actually says:

> Just as hospitals that do not have malpractice insurance are not entitled to reimbursement for actual liability claims paid pursuant to [Manual] Section 2162.13, even though those costs are costs actually incurred in the provision of Medicare services, hospitals that select insurers whose liability premiums are not reimbursable [*i.e.*, hospitals with a captive insurer whose investments do not comply with the Manual's investment restriction] are not entitled to have their insurers receive reimbursement for the liability claims actually paid.

*Catholic Health Initiatives*, slip op. at 16-17. This construction of the Manual is not readily supported by the plain text of the Manual provision itself, and as such, the Hospitals did not have fair notice of the interpretation of the Manual applied in this case.

This Court has established the following standard for determining whether a party received fair notice:

> [W]e must ask whether the regulated party received, or should have
> received, notice of the agency's interpretation in the most obvious
> way of all:   by reading the regulations.   If, by reviewing the
> regulations and other public statements issued by the agency, a
> regulated party acting in good faith would be able to identify, with
> 'ascertainable certainty,' the standards with which the agency expects
> parties to conform, then the agency has fairly notified a petitioner of
> the agency's interpretation.

*Gen. Elec. Co. v. U.S. EPA*, 53 F.3d 1324, 1329 (D.C. Cir. 1995).  Here, the PRRB

and district court took a Manual provision that by its own terms applies to hospitals

that have "no insurance protection" and applied it to the Hospitals in this case,

which had, as of June 2000, over $350 million in malpractice insurance protection.

AR 3087.   Because the Hospitals had no notice that the Secretary's Manual

provision would be applied to them in the way that the PRRB applied it, they

should not be penalized based on the retrospective application of that Manual to

the fiscal years at issue here.   *See Gen. Elec.*, 53 F.3d at 1330 (finding that

agency's interpretation was "so far from a reasonable person's understanding of

the regulations that they could not have fairly informed [plaintiff] of the agency's

perspective").

Finally, as the Hospitals described to the PRRB, when the Medicare program

denies reimbursement for expenses incurred on an accrual basis (like the

malpractice premium expenses at issue), it consistently (except in this case) allows

for reimbursement on a cash basis when the expenses are actually paid (like the

liability claims actually paid).   This is true with respect to accrued liabilities that

are not timely liquidated within the period allowed in the Secretary's rules, *see* Provider Reimbursement Manual § 2305, and it is also true with respect to the costs of sick leave, pension payments, or deferred compensation that do not meet the requirements for reimbursement in the year in which the cost was incurred on an accrual basis and are reimbursed as the costs are paid. *See* AR 244, 275; *see, e.g.*, 42 C.F.R. § 413.100(c)(2)(iii)(C) (stating that accrued costs for "[s]ick pay paid on any basis other than that specified in paragraphs (c)(2)(iii) (A) or (B) of this section can be claimed for Medicare payment only on a cash basis for the year in which the benefits are paid"); *id.* § (c)(2)(vii)(A)-(B) (stating that when provider does not meet funding rules for reimbursement on accrual basis, deferred compensation costs are reimbursed on a cash basis).

As discussed above, the failure to support the disparate treatment of similar situations "with a reasoned explanation and substantial evidence in the record" is arbitrary and capricious, and must be reversed. *See, e.g.*, *Burlington N. & Santa Fe Ry. Co.*, 403 F.3d at 776-77. But here, neither the PRRB nor the district court grappled with this inconsistent treatment or made any effort to explain it. AR 12-13; *Catholic Health Initiatives*, slip op. at 16-17.

The mere *conclusion* that a Manual provision that plainly applies only to Hospitals that have no liability insurance should be applied to disallow reimbursement for the malpractice claims paid on behalf of hospitals that

- 53 -

indisputably have hundreds of millions of dollars in malpractice insurance coverage, AR 12-13; *Catholic Health Initiatives*, slip op. at 16-17, does not even approach a "reasoned explanation." This is particularly true in light of the fact that Medicare consistently allows for reimbursement on a cash basis when expenses cannot be accrued on a claims basis. Here again, the decisions below represent just the type of *ipse dixit* approach this Court has previously rejected. *See D&F Trust*, 216 F.3d at 1195-97.

But, of course, the Court need not reach this issue if it invalidates the Secretary's decision to deny reimbursement for the cost of the premiums. In this case, insurance actually existed, premiums were timely paid to the insurer, and claims were timely paid by the insurer. To deny any reimbursement at all based on the Secretary's misguided effort at insurance regulation is clear error and would grant the Secretary power that would be unimaginable to the drafters of the Medicare statute.

## CONCLUSION

For the foregoing reasons, this Court should reverse the district court's entry

of summary judgment for the Secretary.


/s/ Paul D. Clement
Paul D. Clement
Christopher L. Keough
J. Harold Richards
King & Spalding LLP
1700 Pennsylvania Avenue, N.W.
Suite 200
Washington, DC 20006
(202) 737-0500


February 1, 2010

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 11,946 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2003 in 14-point Times New Roman font.

        /s/ Paul D. Clement
Paul D. Clement
Attorney for Appellants

Dated:   February 1, 2010

## CERTIFICATE OF SERVICE

I hereby certify that on this 1st day of February 2010, I served the foregoing

Brief for the Appellants electronically upon opposing counsel shown below:

Dana Kaersvang
U.S. Department of Justice
(DOJ) Civil Division, Appellate Staff
Room 7230
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001
(202)-514-5000
Email: Dana.L.Kaersvang@usdoj.gov

R. Craig Lawrence
U.S. Attorney's Office
(USA) Civil Division
555 4th Street, NW
Washington, DC  20530
(202)-514-7159
Email: craig.lawrence@usdoj.gov

Michael S. Raab
U.S. Department of Justice
(DOJ) Civil Division, Appellate Staff
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530-0001
(202) 514-4053
Email:  michael.raab@usdoj.gov

  /s/ Paul D. Clement
Paul D. Clement
Attorney for Appellants

**ADDENDUM**

# Table of Contents

5 U.S.C. § 706 ................................................................................................i

42 U.S.C. 1395x(v)(1)(A) ........................................................................ ii

42 C.F.R. § 413.9 .................................................................................. iii

Provider Reimbursement Manual, (CMS Pub. 15), Forward ....................................v

Provider Reimbursement Manual, (CMS Pub. 15), Part I, § 2162.2.A.4 .............. vii

Provider Reimbursement Manual, (CMS Pub. 15), Part I, § 2162.13 .................. viii

**5 U.S.C. § 706**:

Scope of review

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall--

(1) compel agency action unlawfully withheld or unreasonably delayed; and

(2) hold unlawful and set aside agency action, findings, and conclusions found to be--

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts `are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

**42 U.S.C. 1395x(v)(1)(A):**

Definitions

(v) Reasonable costs

   (1)(A) The reasonable cost of any services shall be the cost actually incurred, excluding therefrom any part of incurred cost found to be unnecessary in the efficient delivery of needed health services, and shall be determined in accordance with regulations establishing the method or methods to be used, and the items to be included, in determining such costs for various types or classes of institutions, agencies, and services; except that in any case to which paragraph(2) or (3) applies, the amount of the payment determined under such paragraph with respect to the services involved shall be considered the reasonable cost of such services. In prescribing the regulations referred to in the preceding sentence, the Secretary shall consider, among other things, the principles generally applied by national organizations or established prepayment organizations (which have developed such principles) in computing the amount of payment, to be made by persons other than the recipients of services, to providers of services on account of services furnished to such recipients by such providers. Such regulations may provide for determination of the costs of services on a per diem, per unit, per capita, or other basis, may provide for using different methods in different circumstances, may provide for the use of estimates of costs of particular items or services, may provide for the establishment of limits on the direct or indirect overall incurred costs or incurred costs of specific items or services or groups of items or services to be recognized as reasonable based on estimates of the costs necessary in the efficient delivery of needed health services to individuals covered by the insurance programs established under this subchapter, and may provide for the use of charges or a percentage of charges where this method reasonably reflects the costs. Such regulations shall (i) take into account both direct and indirect costs of providers of services (excluding therefrom any such costs, including standby costs, which are determined in accordance with regulations to be unnecessary in the efficient delivery of services covered by the insurance programs established under this subchapter) in order that, under the methods of determining costs, the necessary costs of efficiently delivering covered services to individuals covered by the insurance programs established by this subchapter will not be borne by individuals not so covered, and the costs with respect to individuals not so covered will not be borne by such insurance programs, and (ii) provide for the making of suitable retroactive corrective adjustments where, for a provider of services for any fiscal period, the aggregate reimbursement produced by the methods of determining costs proves to be either inadequate or excessive.

**42 C.F.R. § 413.9:**

Cost related to patient care

a)   Principle. All payments to providers of services must be based on the reasonable cost of services covered under Medicare and related to the care of beneficiaries. Reasonable cost includes all necessary and proper costs incurred in furnishing the services, subject to principles relating to specific items of revenue and cost. However, for cost reporting periods beginning after December 31, 1973, payments to providers of services are based on the lesser of the reasonable cost of services covered under Medicare and furnished to program beneficiaries or the customary charges to the general public for such services, as provided for in Sec. 413.13.

b)  Definitions--

(1) Reasonable cost. Reasonable cost of any services must be determined in accordance with regulations establishing the method or methods to be used, and the items to be included. The regulations in this part take into account both direct and indirect costs of providers of services. The objective is that under the methods of determining costs, the costs with respect to individuals covered by the program will not be borne by individuals not so covered, and the costs with respect to individuals not so covered will not be borne by the program. These regulations also provide for the making of suitable retroactive adjustments after the provider has submitted fiscal and statistical reports. The retroactive adjustment will represent the difference between the amount received by the provider during the year for covered services from both Medicare and the beneficiaries and the amount determined in accordance with an accepted method of cost apportionment to be the actual cost of services furnished to beneficiaries during the year.

(2) Necessary and proper costs. Necessary and proper costs are costs that are appropriate and helpful in developing and maintaining the operation of patient care facilities and activities. They are usually costs that are common and accepted occurrences in the field of the provider's activity.

c) Application

(1) It is the intent of Medicare that payments to providers of services should be fair to the providers, to the contributors to the Medicare trust funds, and to other patients.

- iii -

(2) The costs of providers' services vary from one provider to another and the variations generally reflect differences in scope of services and intensity of are. The provision in Medicare for payment of reasonable cost of services is intended to meet the actual costs, however widely they may vary from one institution to another. This is subject to a limitation if a particular institution's costs are found to be substantially out of line with other institutions in the same area that are similar in size, scope of services, utilization, and other relevant factors.

(3) The determination of reasonable cost of services must be based on cost related to the care of Medicare beneficiaries. Reasonable cost includes all necessary and proper expenses incurred in furnishing services, such as administrative costs, maintenance costs, and premium payments for employee health and pension plans. It includes both direct and indirect costs and normal standby costs. However, if the provider's operating costs include amounts not related to patient care, specifically not reimbursable under the program, or flowing from the provision of luxury items or services (that is, those items or services substantially in excess of or more expensive than those generally considered necessary for the provision of needed health services), such amounts will not be allowable. The reasonable cost basis of reimbursement contemplates that the providers of services would be reimbursed the actual costs of providing quality care however widely the actual costs may vary from provider to provider and from time to time for the same provider.

**Provider Reimbursement Manual, (CMS Pub. 15), Forward:**

This manual provides guidelines and policies to implement Medicare regulations which set forth principles for determining the reasonable cost of provider services furnished under the Health Insurance for the Aged Act of l965, as amended.  These "Principles of Reimbursement for Provider Costs" have been published in HIRM-l.  The provisions of the law and the regulations are accurately reflected in this manual, but it does not have the effect of regulations.

The Social Security Administration (SSA) also publishes quarterly the "Social Security Rulings" under the authority of the Commissioner of Social Security for the purpose of making available official rulings relating to the health insurance program and the other programs under his jurisdiction.  The rulings contain appeals case decisions, as well as statements of policy and interpretations of the law (title XVIII of the Social Security Act-Medicare) and regulations which have precedential effect.

Rulings are intended to exemplify general manual instructions and do not alter existing policy guidelines.   However, they may place more emphasis on a particular program are that has been identified as a problem.  The rulings do not have the force and effect of a statute or regulations, but provide illustrative case material useful in interpreting and applying policies and procedures contained in instructional issuances.

The procedures and methods set forth in this manual have been devised to accommodate program needs and the administrative needs of providers and their intermediaries and will assure that the reasonable cost regulations are uniformly applied nationally without regard to where covered services are furnished.  The manual contains informational and procedural material on various aspects of the determination of cost and to assist provider in preparing annual cost reports.  The provider's intermediary will issue any necessary supplementary instructions as appropriate for local guidance on items relating to cost determination.  For any cost situation that is not covered by the manual's guidelines and policies, generally accepted accounting principles should be applied.

Under generally accepted accounting principles, or under the "Principles of Reimbursement for Provider Costs" there may be more than one method for handling a particular cost item; in such case the method elected by the provider must be consistently followed in subsequent reporting periods. A change of method must be approved by the intermediary (or SSA for providers dealing

directly with the Government) on a prospective and not retrospective basis.  Where the manual sets a time limit for requesting such change, or limits the number of changes, the provider and intermediary will be guided by the manual instructions.

**Provider Reimbursement Manual, (CMS Pub. 15), Part I, § 2162.2.A.4:**

In the case of offshore captives, investments by a related captive insurance company are limited to low risk investments in United States dollars such as bonds and notes issued by the United States Government; debt securities issued by United States corporations or governmental entities within the United States rated in the top two classifications by United States recognized securities rating organizations at the time of investment; debt securities of foreign subsidiaries of United States corporations rated in the top two classifications by United States recognized securities rating organizations at the time of investment where the parent United States corporations guaranteed (on the face of the securities) payment of the subsidiaries' securities; and deposits (including Certificates of Deposit) in United States banks or their foreign subsidiaries, and foreign banks rated in the top two short term classifications by United States recognized securities rating organizations. Low risk investments may also include investments of non-United States issuers including foreign governments and corporations and supranational agencies rated in the top two classifications by United States recognized securities rating organizations (effective with investments made on or after 10/11/91). Effective for investments made on or after 10/06/95, the limitation on related offshore captive insurance company investments is extended to include the above described low risk investments rated in the top three classifications by United States recognized securities rating organizations. Additionally, investments may include dividend paying equity securities listed on a United States stock exchange provided that the investment in equity securities does not exceed ten percent of the company's admitted assets, with the investment in any specific equity issue further limited to ten percent of the total equity security investment. (All such captives are required to annually submit to a designated intermediary a certified statement from an independent certified public accountant or actuary attesting to compliance or non-compliance with these requirements for the previous period.) These investments cannot be pledged or used as collateral for loans obtained by the captive or parties related to the captive either directly or indirectly, nor may investments be made in a related organization.

**Provider Reimbursement Manual, (CMS Pub. 15), Part I, § 2162.13:**

Absence of Coverage.--Where a provider, other than a governmental (Federal, State, or local) provider, has no insurance protection against malpractice or comprehensive general liability in conjunction with malpractice, either in the form of a limited purpose or commercial insurance policy or a self-insurance fund as described in §2162.7, any losses and related expenses incurred are not allowable.